**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BO JIN and YANG SONG, individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br><br>RICHARD XIA, a/k/a YI XIA;  JULIA YUE, a/k/a JIQING YUE; FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC; EEGH, L.P.; EASTERN EMERALD GROUP, LLC; EEGH II, L.P.; LAGUARDIA PERFORMANCE CENTER, LLC; JOHN AND JANE DOES 1-10;<br><br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED**<br><br>Case No.: 1:22-cv-740 |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs BO JIN and YANG SONG, individually and on behalf of all others similarly situated, by and through Plaintiffs' undersigned attorneys, bring this action against RICHARD XIA, a/k/a YI XIA (hereafter, "Xia");  JULIA YUE, a/k/a JIQING YUE (hereafter, "Yue"); FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC (hereafter, "Fleet" or the "Regional Center"); EEGH, L.P. (hereafter, "EEGH I"); EASTERN EMERALD GROUP, LLC (hereafter, "Emerald"); EEGH II, L.P. (hereafter, "EEGH II"); LAGUARDIA PERFORMANCE CENTER, LLC (hereafter, "LaGuardia"), and JOHN and JANE DOES 1-10, and allege as follows:

**INTRODUCTION**

1. On information and belief, between 2014 and 2017, Defendants solicited BO JIN and YANG SONG and others similarly situated to invest $500,000 each, plus administrative and other fees, in the development and construction of a five-star hotel and complex, to be completed under the guise of two phases called the "Eastern Emerald Project" and a subsequent expansion called the "Eastern Emerald Project II" (hereafter, individually "EEGH I" and "EEGH II," and collectively, "the Project"), to be located at and around 112-51 Northern Boulevard in Corona, Queens County, New York.  The Project was presented to Plaintiffs (herein the "EB-5 investors") as an EB-5 Investment that would qualify them to apply for United States permanent residency under the EB-5 Immigrant Investment Program administered by the United States Citizenship and Immigration Services ("USCIS").   The EB-5 Program, broadly stated, allows immigrants to obtain green cards if they invest a minimum of $500,000 in a project in the United States that preserves or creates ten permanent full-time US jobs (per investor), and if they satisfy other requirements.

2. In exchange for their investments, prospective EB-5 investors were made limited partners of either EEGH I or EEGH II, the two partnerships formed as investment vehicles for deploying the investors' pooled capital investment.  Plaintiffs here, and others similarly situated, were participants in either EEGH I or the EEGH II partnership.

3. Plaintiffs' capital and the capital of others similarly situated, amounting to $500,000 plus $50,000 in administrative fees each, were pooled by the Fleet Regional Center (the General Partner of both EEGH I and EEGH II) and loaned to Emerald or LaGuardia (the Project developers attached to the work to be funded by EEGH I and EEGH II, respectively, and

collectively, "the Developers").  On information and belief, between 2014 and 2017, Defendants are believed to have collected at least $173 million in contributions from investors for the Eastern Emerald Project through EEGH I and EEGH II.

4.     At all relevant times, every component of this EB-5 Project – *i.e.* EEGH I, EEGH II, the Developers Emerald and LaGuardia, and the Fleet Regional Center (the entity responsible for overseeing compliance with the EB-5 program as well as the General Partner of both limited partnerships) – were owned, controlled and dominated by Xia and his agents, including Yue.

5.     In this way, Xia and his agents structured the EB-5 investment raise and the EB-5 Investors' participation in order to control all money flows to take advantage of the foreign investors who entrusted Xia with their money. Thus, at all relevant times Xia and his agents, including Yue, controlled the investment raises, expenditures, and all aspects of the agreements involving the partnerships and the Developers.

6.     Plaintiffs, and others similar situated, were solicited for participation in the Project by representations contained in EEGH I and EEGH II Limited Partnership Agreements (respectively, the "EEGH I LPA", the "EEGH II LPA", or collectively, "the LPAs"), Private Placement Memoranda the (respectively, the "EEGH I PPM", the "EEGH II PPM", or collectively, "the PPMs"), and the Comprehensive Plans (respectively, the "EEGH I Plan", the "EEGH II Plan", or collectively, "the Plans") (altogether and collectively, the "Offering Documents").  Defendants were solely responsible for producing and drafting the Offering Documents, and Plaintiffs are informed, believe, and allege that Xia was aware of, reviewed, approved, and/or personally created or included the representations they contained.

7.     Although the Offering Documents differ slightly between those presented to the EEGH I and EEGH II investors, with the EEGH II investment directed toward an "expansion" of the Project represented to the EEGH I investors, they contain identical or near-identical false representations as to the Project in the PPMs and Plans, essentially identical terms in the LPAs, and substitute loans to interchangeable developers (Emerald and LaGuardia), again both owned and controlled by Xia and his agents.

8.     Additionally, the investments of the EEGH I and EEGH II investors were commingled, misappropriated, misused, and treated interchangeably by Xia such that the Plaintiffs' interests and claims are common, united, and similarly situated for purposes of class certification regardless of whether they joined EEGH I or EEGH II.

9.     Xia formed EEGH I on around December 6, 2013, to solicit EB-5 investment in the initial development and construction of the Project, described by the EEGH I PPM as follows: "The Eastern Emerald Project will encompass the development, management and operation of 5-star hotel, convention center, retail space, restaurant and parking garage."[1]

10.    Before any construction had begun on the Project, Xia formed EEGH II on around September 15, 2015, to solicit further EB-5 investment in the development and construction of an "expansion" of the Project, described by the EEGH II PPM as follows: "The Project will encompass the development, construction and operation of an expansion to a 5-star hotel, which will result in an additional 556,398 SF being added to the overall building; an additional 294 5-star luxury hotel rooms; an additional 4 floors added to the

---

[1] EEGH I PPM, at 1.

building; a performing arts center across 5 floors; as well as additional retail space, restaurant space, and parking garage space."[2]

11.     Additionally, the investments of the EEGH I and EEGH II investors were commingled, misappropriated, misused, and treated interchangeably by Xia, Yue, and his agents, such that the investors' interests and claims are common, united, and similarly situated for purposes of class certification regardless of whether they joined EEGH I or EEGH II.

12.     The Plans represented that the initial development and construction of the Project would consist of:

- a 5-star luxury hotel consisting of 25 floors and 498 ocean-view hotel rooms;[3]

- a total floor area of 643,180 square feet;[4]

- a modern convention center certified by the International Association of Conference centers with 105,964 square feet;[5]

- a retail shopping area with 97,180 square feet;[6]

- the creation of 2,913 jobs within the first two years of operations;[7]

- "[j]obs will be created within 2.5 year after I-526 petition approval";[8]

- total projected 5-year hotel revenue of approximately $217 million;[9] and

---

[2] EEGH II PPM, at 5.

[3] EEGH I, LP Comprehensive Business Plan, at 1.

[4] *Id.* at 2.

[5] *Id.* at 1-2.

[6] *Id.* at 2.

[7] *Id.* at 17, 40.

[8] *Id.* at 18.

[9] *Id.* at 43.

- total projected 5-year hotel revenue of approximately $218 million;[10] and

- the total development of the Project would take 42 months, with 30 months for construction.

13. These representations were false and fraudulent. On information and belief, plans submitted to the Department of Buildings indicate the Project as described was not only never applied for, but would have been impossible to build based on zoning and land use ordinances, which Defendants knew at all relevant times

14. Defendants represented that Plaintiffs' investments, and those of others similarly situated, would be applied solely for Project-related uses. The Offering Documents provide that Plaintiffs' investments would be directed only toward the development, construction, and operation of the Project through loans to Emerald and LaGuardia for EEGH I and EEGH II, respectively. The investments, Defendants promised, would be returned when the loan reached maturity.

15. These representations were false and fraudulent, which Defendants knew at all relevant times. On information and belief, the investments of Plaintiffs and others similarly situated were frequently misused and misappropriated for other purposes, including to fund another EB-5 hotel project used by Defendants to defraud other investors (the "Eastern Mirage Project") or for Xia's personal enrichment and benefit, including transfers through over 150 bank accounts he set up to conceal his misconduct, mask his transactions, and direct Plaintiffs' investments to his personal bank accounts, the accounts of his wife, Yue, and the accounts of his various other related and unrelated companies. Xia further used Plaintiffs' investments to purchase luxury real estate in his own name or the name of his

---

[10] *Id.* at 17.

wife, pay mortgage payments on non-Project properties, to obtain residential mortgages, to make rental payments for apartments in Manhattan rented by his wife, and for personal retail purchases, while at all times treating Plaintiffs' investments as his own personal funds.

16.     The Offering Documents represented that the Project would be "funded from a variety of sources," including government bonds, loans from banks and a broker-dealer, and substantial equity contributions from Xia.

17.     These representations were false and fraudulent, which Defendants knew at all relevant times.  Defendants never secured or attempted to secure any Project funding other than the EB-5 investments of Plaintiffs and others similarly situated.  This resulted in a substantial shortfall that Defendants knew or should have known would create a significant risk of Project failure.

18.     The Offering Documents represented to Plaintiffs and others similarly situated that the Project's "Management and Development" team included Xia and the Racanelli Construction Group, Inc. ("Racanelli").  The Offering Documents describes Racanelli as "one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services," and that Racanelli, "[s]ince its founding," had completed numerous projects, including "corporate headquarters, industrial complexes, hospitals," and many other types of buildings.  The Plans and other marketing materials further represented that Racanelli had "six decades" of construction experience.  The PPM and the Plans also exalt Xia for his experience in real estate development.

19.     These representations were false and fraudulent, which Defendants knew at all relevant times.  Racanelli was formed in 2011 and had no history other than serving as Xia's own

in-house construction company.  Defendants in fact stole the description of Racanelli's background from the website of an unrelated construction company, Racanelli Construction Company, Inc. (the "True Racanelli").  In doing so, Defendants hoped and intended to exploit True Racanelli's name and reputation for their own personal gain. Also, the descriptions of Xia's extensive real estate background in the PPM and Plans were false, as he had only completed one small apartment building prior to undertaking the Project.

20.     Defendants represented to investors that the Project would be affiliated with the Westin Hotel chain.  This representation was false and fraudulent, as no such affiliation was ever contemplated, never existed, and Defendants knew there were no plans for or possibility of any such affiliation.

21.     The Offering Documents presented to both EEGH I and EEGH II investors finally also state there were "no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand" and that the General Partner "is accountable to the Partnership as a fiduciary and consequently must exercise good faith and integrity in handling the Partnership's affairs."  Xia owed Fleet Regional Center and both EEGH I and EEGH II a fiduciary duty at all relevant times as President, Chief Executive Officer, and Managing Member of Fleet Regional Center.

22.     These representations were false and fraudulent, which Defendants knew at all relevant times.  Xia, who owns, controls, and/or dominates the Project Developers, Emerald and LaGuardia, and the Project General Partner, Fleet, was in a self-dealing position on both sides of any and all construction and development agreements.  Xia bound the Developers to rental agreements with the Project's landowners, under which both Emerald and

8

LaGuardia have never made any rental payments, and both of which have been in default for years.  Xia, as owner of the landowner and the Developers, could at any time pursue remedies for default against the Developers and cause a bankruptcy; alternatively, Xia could enforce payment obligations owed by the Developers, which would reduce the amount available for repayment of Plaintiffs and others similarly situated.

23.    Construction on the Project was never completed, and in fact, was never substantially begun.  To date, the Project is a plot of empty land surrounded by concrete walls.

## JURISDICTION AND VENUE

24.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1).  The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs. Plaintiffs, including those similarly situated, and Defendants are citizens of, and domiciled in, different jurisdictions, either foreign or domestic.  This action, which is brought back under Fed. R. Civ. P. 23, is not a collusive one to confer jurisdiction that the court would otherwise lack.

25.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because (1) there are 100 or more class members, (2) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (3) there is minimal diversity as described above.

26.    This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

27.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1367.  Substantial acts in furtherance of the alleged fraud and/or breaches of fiduciary duty, or the effects of such, have occurred within this Judicial District.  Defendants reside in, are inhabitants of, or

transact business in the Eastern District of New York, and many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

28.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## **PARTIES**

29.   Plaintiff BO JIN is a citizen of and currently resides in the People's Republic of China.

30.   Plaintiff YANG SONG is a citizen of and currently resides in the People's Republic of China.

31.   Defendant FLEET NEW YORK METROPOLITAN REGIONAL CENTER, LLC f/k/a FEDERAL NEW YORK METROPOLITAN REGIONAL CENTER, LLC (herein "Fleet" or "Regional Center") is a New York limited liability company, with its principal place of business and service of process address at 136-20 38th Ave., Suite 10F, Flushing, New York, is the General Partner of the Partnership.

32.   Defendant EASTERN EMERALD GROUP, LLC (herein "Emerald") is, on information and belief, a New York limited liability company, with its principal place of business at 136-20 38th Ave., Suite 10F, Flushing, New York.

33.   Defendant LAGUARDIA PERFORMANCE CENTER, LLC (herein "LaGuardia") is, on information and belief, a New York limited liability company, with its principal place of business at 136-20 38th Ave., Suite 10F, Flushing, New York.

34.     Defendant EEGH, L.P. (herein "EEGH I") is a New York limited partnership, with its principal place of business and service of process address at 136-20 38th Ave., Suite 10F, Flushing, New York.

35.     Defendant EEGH II, L.P. (hereafter, "EEGH II") is a New York limited partnership, with its principal place of business and service of process address at 136-20 38th Ave., Suite 10F, Flushing, New York.

36.     Defendant RICHARD XIA a/k/a YI XIA (hereafter, "Xia"), an individual who, upon information and belief, resides in Flushing, New York, is the President of, and controls and dominates, Fleet, EEGH I, EEGH II, Emerald, and LaGuardia.

37.     Defendant JULIA YUE, a/k/a JIQING YUE (hereafter, "Yue"), an individual who, upon information and belief, resides in Flushing, New York, is the wife and Defendant Xia, acted as an agent of Xia and Defendant entities at all relevant times, and was an authorized signatory on numerous bank accounts used to further the acts described herein.

## **FEDERAL CLASS ACTION ALLEGATIONS**

### THE CLASS SATISFIES THE REQUIREMENTS OF RULES 23(A) AND 23(B)(3) OF THE FEDERAL RULES OF CIVIL PROCEDURE

38.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that invested in the Partnership and who were damaged thereby (hereafter, the "Class"). Excluded from the Class are Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

39. Conforming with Rule 23(a), the members of the Class are so numerous that joinder of all members is impracticable.  Upon information and belief, there are at least 320 members of the Class.

40. Conforming with Rule 23(a), Plaintiffs' claims are typical of the claims of the members of the Class. The losses suffered by the named Plaintiffs were occasioned by the same events, patterns of practice, and courses of conduct that give rise to the claims of the other members of the Class. The named Plaintiffs are members of the Plaintiffs' class and the losses to the named Plaintiffs are based on the same legal theories.

41. Conforming with Rule 23(a), Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and complex commercial litigation.

42. Satisfying Rule 23(b)(3), common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    A.    Whether the Defendants defrauded Plaintiffs and other Class Members as alleged herein;

    B.    Whether Fleet and Xia owed fiduciary duties to Plaintiffs and other Class Members;

    C.    Whether any fiduciary duties owed were breached;

    D.    Whether each Defendant aided and/or abetted any breaches of fiduciary duty;

    E.    Whether named Defendants, or other individuals known or unknown, conspired to defraud and breach fiduciary duties owed to the Plaintiffs and other Class Members;

    F.    To what extent Plaintiffs and Class Members have sustained damages and the proper measure of damages.

43.     Satisfying Rule 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small in relation to the cost of litigation, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## STATEMENT OF FACTS

### A.  The EB-5 Program

44.     Plaintiffs incorporate each and every allegation contained in paragraphs 1-43 of this Petition as if set forth in full herein.

45.     As stated above, the EB-5 Immigrant Visa Program ("EB-5 Program") administered by the U.S. Citizenship and Immigration Services ("USCIS") permits qualified foreign investors to apply for permanent residency if they invest in certain commercial enterprises in the U.S. that meet certain requirements, including, among others, the creation or preservation of at least 10 U.S. jobs per investor.

46.     Businesses that seek to raise funds through the EB-5 Program will usually set up a new entity, often a limited partnership, like EEGH I here, and solicit foreign investors seeking permanent residency in the US to become limited partners in exchange for their EB-5 investments.

47.     Following subscription as limited partners and contributing the requisite capital, EB-5 investors are able to file a Form I-526 Immigration Petition for Entrepreneur ("I-526 Petition") with USCIS to demonstrate, in view of the Project's business plan and supporting documents, that the investment fulfills EB-5 Program criteria.  8 U.S.C. 11 §

1153(b)(5); 8 C.F.R. § 204.6(a) and (j).  Upon approval of the I-526 Petition, USCIS will confer on the applicant conditional permanent residency, known as a "conditional green card."  8 U.S.C. § 1886b(a)(1).

48.  Within two years of receiving a conditional greed card, an investor is expected to file a Form I-829 Petition by Entrepreneur to Remove Conditions on Permanent Resident Status ("I-829 Petition") with the USCIS to establish that the investor has fulfilled EB-5 Program requirements, approval of which will render the investor's green card permanent.  8 U.S.C. § 1886b(c); 8 C.F.R. § 216.6(a) and (c).  Among other requirements, an EB-5 investment must create or preserve at least 10 full-time jobs for U.S. workers to qualify an investor for unconditional permanent residency.

**B.  The EEGH I Partnership**

49.  Xia formed EEGH I on around December 6, 2013, to serve as an investment vehicle for Plaintiffs and others similarly situated to, ostensibly, finance the Project, which was pitched as a luxury hotel complex to be built in Queens County, New York.

50.  Simultaneously, Xia formed Emerald, on around December 6, 2013, to serve as a developer for the Project that would be financed by EEGH I investors.

51.  Per a Loan Agreement dated December 18, 2013 (hereafter, the "EEGH I Loan Agreement"), EEGH I agreed to loan $80 million in EB-5 investor funds, at 2% interest, ostensibly for purposes of Project development, to Emerald.  Purportedly, the loan would allow Emerald to "develop, construct and operate a commercial mixed-use project that includes a 5-star hotel, convention center, parking garage, restaurant and retail space."  Xia signed the Loan Agreement on behalf of EEGH I and his wife, Yue, signed on behalf of Emerald.

14

52.     On information and belief, beginning in 2014, Defendants started soliciting the purported

class of foreign EB-5 Program investors (the "EB-5 Investors") to fund the loan from

EEGH I to Emerald.  To attract investment, Defendants created the Offering Documents to

promote interest from foreign investors, including the Plaintiffs and others similarly

situated.  As the General Partner, the Fleet Regional Center was to pool and direct

investors' capital contributions as a loan to Emerald, which was to be the "job creating

entity" (hereafter, "JCE") for EB-5 Program compliance, and which would then apply the

loan proceeds for the construction and development of the Project, to consist of a luxury

hotel, convention center, and commercial space for retail and restaurants.

53.     Plaintiffs and others similarly situated were presented with the Offering Documents, which

offered limited partnership interests in EEGH I in exchange for a subscription amount of

$500,000 each.  These Offering Documents contained material representations as to the

EB-5 Project investment.

54.     Under the "EASTERN EMERALD PROJECT" section in the EEGH I PPM, Defendants

represented that:

> "The Partnership will [sic] using the capital investment from EB-5 investors to
>
> finance the development, construction and operation of a project located in Corona,
>
> City of New York, Queens, New York ("Eastern Emerald Project").
>
>
>
> The Eastern Emerald Project is expected to consist [sic] a 498-room 5-star luxury
>
> hotel, retail stores (97,180 square feet), an IACC certified international

conventional center (105,964 square feet), a restaurant (11,300 square feet), and a parking garage with 400 parking spaces covering 82,490 square feet."[11]

55.     Under the "LOAN AGREEMENT" section in the EEGH I PPM, Defendants represented that "[t]he loan amount will be for a minimum of $500,000 and a maximum of $80,000,000 based upon the number of Units sold in this Offering.  In the event that the maximum loan amount is not advanced, the Borrower will arrange alternative financing."  The $80 million in EEGH I EB-5 investment was stated to be out of a total $190 million investment in the Project.

56.     An "Amendment No. 1" to the Loan Agreement, dated October 21, 2015, raised the loan amount from $80 million to $110 million.  Xia signed this Amendment No. 1 on behalf of both EEGH I and Emerald.

57.     Emerald, which is of course controlled and dominated by Xia, has not to date made any repayments toward the loan from EEGH I and the capital contributions of Plaintiffs and others similarly situated.

**C.  The EEGH II Partnership**

58.     Xia formed LaGuardia on around September 15, 2015, to serve as the developer for expansion of the Project.

59.     Per a Loan Agreement dated October 18, 2015 (hereafter, the "Loan Agreement"), EEGH II agreed to loan to LaGuardia "up to $80 million" in EB-5 investor funds, at 1% [or 2%] interest, ostensibly for purposes of Project development.  The loan was purported to be to allow LaGuardia to "develop, construct and operate the expansion to a 5-star hotel, which will result in an additional 556,398 SF being added to the overall building, an additional

---

[11] EEGH I PPM, at 6.

294 5-star luxury hotel rooms, an additional 4 floors added to the building; a performing arts center across 5 floors; as well as additional retail space, restaurant space and parking garage space." Xia signed the Loan Agreement on behalf of EEGH II and his wife, Yue, signed on behalf of LaGuardia.

60. Beginning in 2015, Defendants began soliciting foreign EB-5 Program investors to fund the loan from EEGH II to LaGuardia. To attract investment, Defendants created the Offering Documents to promote interest from foreign investors, including the EEGH Plaintiffs and others similarly situated. Fleet was to pool and direct investors' capital contributions as a loan to LaGuardia, which was to be the "job creating entity" (hereafter, "JCE") for EB-5 Program compliance, and which would then apply the loan proceeds for the construction and development of the Project, to consist of an "expansion" to the luxury hotel complex to be funded by EEGH I.

61. Plaintiffs and others similarly situated were presented with the Offering Documents, which offered limited partnership interests in EEGH II in exchange for a subscription amount of $500,000 each. These Offering Documents contained material representations as to the EB-5 Project investment.

62. Under the "THE PROJECT" section in the EEGH II PPM, Defendants represented that:

"The Partnership will use the capital investment from EB-5 investors to finance the development, construction and operation for an expansion of a mixed-use commercial building in Corona, Queens County, overlooking Flushing Bay, which includes a give star hotel, restaurants, retail space, a performing arts center and parking garage. When complete, the hotel will boast 29 floors of 5-star ocean view

rooms.  Additionally, the performing arts center and restaurant will be operated by the Project, and the retail spaces will be leased out to tenants.

The original building is a 25-story, 643,180 SF structure that includes 498 5-star luxury hotel rooms equal to 346,246 SF across 25 floors, a 1-story 105,964 SF convention center, 97,810 SF of retail space across 1 floor, 11,300 SF of restaurant space across 1 floor, and a 1-story 82,490 SF parking garage.

The Project will add to the original mixed-use commercial building by expanding on the existing 25 floors, as well as adding an additional 4 stories overall.  The expansion will result in an additional 556,398 SF being added to the overall building SF.  The expansion will also add an additional 294 5-star luxury hotel rooms equal to 383,803 SF across 29 floors; a 78,954 SF performing arts center across 5 floors; an additional 39,089 SF of retail space across 6 floors; an additional 46,231 of restaurant space across 5 floors; and an additional 8,321 of parking garage space.

The completion of the Project will result in a 29-story, 1,199,578 SF, mixed-use commercial building.  The completed building will have a total of 792 5-star luxury hotel rooms equal to 730,049 SF across all 29 floors; as well as a 1-story, 105,964 SF convention center; a 5-story, 78,954 SF performing arts center; 136269 SF of retail space across 6 floors; 57,531 SF of restaurant space across 5 floors; and a 1-story, 90,811 SF parking garage."

63.     Under the "LOAN AGREEMENT" section in the EEGH II PPM, Defendants represented that "[t]he loan amount will be for a minimum of $500,000 and a maximum of $80,000,000 based upon the number of Units sold in this Offering.  Borrower and Lender may amend

the Principal of the Loan if Lender is able to raise additional funding from Lender's Investors.  In the event that the maximum loan amount is not advanced, the Borrower will arrange alternative financing."  The $80 million in EEGH II EB-5 investment was stated to be out of a total approximately $180 million investment in the Project.

64. LaGuardia, which is of course controlled and dominated by Xia, has not to date made any repayments toward the loan from EEGH II and the capital contributions of Plaintiffs and others similarly situated.

**D.  Common Contract Terms and Obligations**

65. Both PPMs provide that the loan to be financed by Plaintiffs and others similarly situated was to reach maturity "at the date of (1) five (5) years from the date of the last advance under the loan, or (2) the date all EB-5 investors have ceased participating in the EB-5 program, whichever is later."[12]

66. Both LPAs provide at section 9.1(b) that "[f]ollowing the disposition by the Partnership of all or any portion of [sic] the Investment, the General Partner shall distribute, as soon as practicable, to the Limited Partners (pro rata in accordance with each Limited Partner's Pro Rata Share) and to the General Partner an amount equal to the net proceeds realized from such disposition in accordance with the allocation percentage set forth in Section 8.2…"

67. Both LPAs define the "Investment", at page 3, as "the Partnership's investment, through a loan to finance the development and operation of a commercial project located in Corona, City of New York, Queens, New York."

---

[12] *See* EEGH I PPM, at 9; EEGH II PPM, at 14.

68.     Both LPAs provide at Section 8.2 that "[p]rofits or losses of the Partnership shall be allocated 90% to the Limited Partners pro rata in accordance with each Limited Partner's Pro Rata Share, and 10% to the General Partner."

69.     Both PPMs provide that "[t]he Partnership will send to each Limited Partner, generally within 90 days of the end of each fiscal year of the Partnership, an accounting report including a balance sheet and statements of income, changes in Partner's equity and cash flows, prepared in accordance with generally accepted accounting principles, plus a schedule and summary description of the investments owned by the Partnership at year-end and a statement for each Limited Partner of its capital account and tax information necessary for completion of its tax returns."[13]

70.     Both LPAs provide under Article 18.1 that "[t]he General Partner shall keep and maintain full, complete and accurate books of account and records of the Partnership with respect to the Partnership's activities and financial affairs at the principal address of the Partnership. Such books of account and records shall be retained by the General Partner for a minimum period of seven years or longer if required by applicable law and shall be made available for review by Limited Partners upon request."

71.     To date, Fleet has refused to permit Plaintiffs and others similarly situated from inspecting the books and records of EEGH I and EEGH II.

72.     Both LPAs provide under Article 18.2 that "[w]ithin 90 days after the end of each Fiscal year, the General Partner shall send to each person who was a Limited partner at the end of such Fiscal Year a report summarizing the status of the activities of the Limited Partnerships as at the end of the Fiscal Year.  The General Partner shall also send therewith

---

[13] *See* EEGH I PPM, at 4-5; EEGH II PPM, at 9

a balance sheet, as of the end of such Fiscal Year as well as unaudited statements of income, each Limited Partner's capital account balance, gains and losses and cash flow statement for such Fiscal Year all of which shall be prepared by the Accountants in accordance with GAAP."

73. To date, Fleet has not provided Plaintiffs and others similarly situated with any annual reports for EEGH I and EEGH II.

74. Both LPAs provide under Article 18.3 that "[t]he General Partner may, in its discretion, send to the Limited Partners quarterly and such other reports as the General Partner sees fit. The General Partner will distribute on an annual basis information to enable the Partners to prepare their respective income tax returns, including, without limitation, a Form K-1 or other appropriate information."

75. Both LPAs provide under Article 6.7 that "[t]he Register and any other such books or records shall be kept by the General Partner at the principal address of the Partnership. The General Partner shall make the Register and any other books or records relating to the Partnership or the Partners available for inspection by any Limited Partner during normal business hours upon reasonable written notice."

76. Plaintiffs, and others similarly situated, each made capital investments of $500,000.00 and paid $50,000 in administrative processing fees directly to Fleet in reliance on the above-stated representations in the Offering Documents and in conformance with their respective LPAs, Subscription Agreements, and Escrow Agreements, and were made limited partners in EEGH I or EEGH II, with the understanding that the loans would be repaid to the Partnerships once they matured in five years, that they would receive distributions from

any proceeds realized, and that Fleet would furnish any documents necessary for Plaintiffs and others similarly situated to pursue their unrestricted Green Cards with the USCIS.

77.     Both PPMs provide that each "Partnership's Loan will be used to finance [the specified phase] of the project."

78.     Each of the Loan Agreements between EEGH I and Emerald, and between EEGH II and LaGuardia, provides under a "Mandatory Use of Proceeds" clause that: "Borrower agrees that the proceeds of the Loan shall only be used for the development, construction, and operation of the Project."  The term "Project" is defined to refer to the Eastern Emerald Project in the EEGH I and EEGH II Loan Agreements.

79.     The "Mandatory Use of Proceeds" provision is material in restricting the uses to Project-specific purposes and providing assurances that funds would not be appropriated for other projects in which Plaintiffs and others similarly situated did not agree to participate.

**E.  Xia's Authority and Control Over Partnership Funds**

80.     The LPAs granted Xia, as President, CEO, and Managing Member of the General Partner, Fleet Regional Center, broad and extensive authority to act on behalf of EEGH I and EEGH II, to represent and bind each partnership, and "to do any and all things necessary for, incidental to, or connected with carrying out the activities of the Partnership."

81.     The LPAs further authorized Fleet to "raise capital for the Partnership by offering for sale and selling Units," and to "do all things in that regard in the name of and on behalf of the Partnership, including preparing and filing such offering or other documents as the General Partner deems to be necessary or desirable, and all things done by the General Partner are hereby ratified and confirmed."

82.     The PPMs provide that the "General Partner exercises ultimate authority for overall management of the Partnership and is responsible for its day to day operations" and "may retain such other suitable parties to provide services to the Partnership, including, without limitation, legal, consulting, marketing, administration, and accounting services."

**F.  Defendants' Plan to Defraud Plaintiffs**

83.     Defendants were at all relevant times engaged in a common scheme to solicit, misuse, and misappropriate the investments of foreign EB-5 investors, including Plaintiffs and others similarly situated, and used manipulation and deception to further their scheme, including material misrepresentations and omissions.

84.     Xia personally participated in the solicitation of Plaintiffs and others similarly situated, and he himself traveled to China to promote the investments.

85.     On information and belief, while on a trip to China in 2014, Xia published a script prepared by a colleague for use in the marketing and promotion of the EEGH Program.  In an email dated July 25, 2014, Xia's colleague remarked that the script was "modified slightly from the version you approved in the spring (to reflect the brochure [Xia Entity Employee] gave me and ou[r] discussion yesterday).  Please let me know of any changes/corrections you wish to see…Here come the remarks."

86.     The "remarks" comprise in part:

"I am very pleased to be back in China with an attractive real estate development opportunity to share with you. On my first visit, great project Eastern Mirage/Westin Hotel . . . track record 100% permanent residency approvals, but no confirmed next project. Now, we have next project.

Boutique Regional Center that works exclusively and hand-in-glove with Fleet Financial Group[.]

Because FNYMRC and Fleet Financial Group are team working solely on NYC real estate developments together, we have deep experience in this field. Based on this experience, we believe that Eastern Emerald's LaGuardia Convention is a rare and special opportunity in New York.  It is:

> 600,000 sq. foot, mixed use development across the street from LAG that would consist of a 300,000 square foot exhibition center, 200,000 square foot meeting space, 800 hotel rooms – plus restaurants, retail space and a 500 spaces of underground parking[.]

> The project will benefit from the support of community leaders and NY State and the U.S. government in the form of $45 million in tax credits[.]

As a potential EB-5 investor you would be an important part of this project, but only a part. The $75 million investment from 150 investors could comprise less than one-third of the projected $228 million development budget. (State, Federal govt, a bank and Fleet Financial would all have large stakes, too).

Invest[m]ent mindset – this is a compelling investment opportunity in its own right."

76.     On information and belief, Xia responded by email with: "everything is fine except the total eb-5 is now $80 million and total construction cost $233 million."

77.     This communication was replete with false misrepresentations of material fact, which were repeated and echoed in written materials provided to investors.  At no time was Westin Hotel affiliated with any of Xia's projects, nor was there ever any prospect or plan for Westin Hotel's involvement.  At no time did Fleet have any "deep expertise" in real estate

development.  The Project was never going to be 600,000 square feet.  The Project as described in Xia's pitch to investors and in the Offering Documents was impossible to build based on applicable zoning and land use ordinances, which Xia and Defendants knew at all relevant times.  No state or federal government, bank, or Fleet Financial Group (hereafter, "FFG") had any "large stakes" in the Project, which was instead almost exclusively funded by EB-5 investment money.

78.     In sum, Defendants' material misrepresentations and omissions to Plaintiffs and others similarly situated included the experience and background of Xia and his "development team"; the Project's association with the Westin Hotel chain; the physical size of the Project; and concealment of the rental agreements between Defendant-owned developers and owners of the Project land, which materially affect investors' risk and recourse for recovery.  Xia misused and misappropriated the funds and controlled them to flow to his own personal benefit and concealed additional material facts from investors.

**G.  Xia's Misappropriation and Misuse of Investors' Funds**

79.     As stated above, Xia opened more than 150 bank accounts that he controlled and used to divert, misuse, and misappropriate the investment funds of Plaintiffs and others similarly situated.

80.     In around December 2013, Emerald acquired the Project land for approximately $17 million.  Xia diverted funds from his other EB-5 project, the Eastern Mirage, for this purchase.  This misappropriation was conducted via two sets of circular bank transfers in June and December 2013.  In June 2013, Xia transferred approximately $1.7 million in funds *dedicated to the Eastern Mirage project* from the accounts of those partnerships to an FFG account, then to a Racanelli account, then to an Emerald account before transfer to

an escrow agent for the sale of the Project land.  In December 2013, Xia appropriated approximately $15.3 million of similarly committed funds from and through the accounts of those partnerships again to FFG accounts, then to Racanelli accounts, then to an Emerald account before transfer to the seller of the Project land.  Xia enacted these transfers either directly or indirectly through his wife, Yue.

81.     On information and belief, Xia misappropriated at least $11.8 million in Project funds invested by Plaintiffs and others similarly situated, which were expressly keyed to Project-specific development and operations, to the unrelated Eastern Mirage project.  In early 2014, the Eastern Mirage project's funding had been exhausted by the 2013 misappropriation of around $17 million in investment funds, as described above.  Xia accordingly misused at least $11.8 million in Project funds from Plaintiffs and others similarly situated to pay costs for the other Eastern Mirage project.

82.     Xia also misappropriated the investments of Plaintiffs and others similarly situated for improper personal enrichment.

83.     In July 2015, Xia funneled approximately $2.3 million of investor funds through EEGH I, Emerald, Racanelli, and accounts of another Xia-owned entity, "Amazon River," for escrow in the purchase of a luxury Manhattan apartment.  Xia never returned funds taken from EEGH I back into the partnership.  During the time the funds were removed, they were unavailable for Project-related uses and became at risk.

84.     Over a period of at least seven years, Xia used these bank accounts, and those of his numerous entities, to misappropriate investors' funds from their intended uses toward his own personal benefit and the benefit of his wife, Yue.  He obfuscated and masked his activities by circulating funds through his entities in transfers that served no legitimate

business purpose.   On information and belief, over $127 million in misappropriated investor funds were moved between his web of self-dealing entities and sham business accounts.

85.   Millions of dollars from investors' funds were transferred to the supposed general contractors from the supposed developers without explanatory invoices justifying these substantial transactions.  As a result, Xia covertly enriched his own entities, and ultimately himself and his wife, without any accountability or transparency to the investors.

86.   On information and belief, in January 2021, the New York State Comptroller Refund Account issued a check for $10,968,787.48, which Emerald received and deposited with CTBC Bank.  Xia used these funds to purchase a $10 million certificate of deposit (hereafter, the "CD") for the benefit of Emerald.   In a loan agreement signed by Xia in around April 2021, Emerald borrowed $10 million from CTBC with the CD as collateral. From around April 30, 2021 to May 25, 2021, $5.6 million of the $10 million loan amount, which should have been used for Project purposes, was funneled into the personal account of Xia's wife, Yue.  Xia also misappropriated over $5 million in "Tax Credits," as identified in the EEGH I PPM, for his personal benefit.

87.   The described conduct and activities highlight Xia's pattern of treating investors' funds as his own personal money. His actions suggest fraudulent intent at the outset and throughout the course of supposed "development" of the Project, and demonstrate his repeated misconduct in enriching himself personally with Project funds he solicited.  For example, Xia admitted in a June 2, 2020 email that he believed he was entitled to dispose of the Project funds as his own personal assets.  To secure a residential mortgage, Xia suggested he be allowed to use an account with "loan proceeds from my EB-5 entity" to meet the

minimum deposit amount.  When the firm denied him on the basis that "if its [sic] EB5 money unfortunately it doesn't work.  It has to be yours personally / your family's money," Xia responded: "What is the definition of Eb-5 money?  It is in the bank account of my entity and I use my property as collateral for it.  If [the firm] lends me money and deposit into my bank account with my hotel as collateral [w]ill it still be considered as [firm] money or [] investor/Deposit money? I feel it is a loosely defined term to call it eb-5 money…"

88.     Xia further authorized over $1.6 million in transfers for purposes unrelated to the Project. Defendants made over $840,000 in payments pertaining to apartments rented by Yue in Manhattan.  Defendants used Project funds for at least $76,000 in retail store purchases, at least $49,760 for restaurant meals and food purchases, and at least $14,000 for hotel expenditures, including luxury hotels in Hawaii.

## H.  Misrepresentations Concerning Project Funding

89.     The Offering Documents falsely represented that funding for the Project would come from "a variety of sources" beyond EB-5 Program investments.  This statement was material in that the availability of multiple sources of funds gave assurances of safety and overstated the Project's prospects for success.

90.     Xia also represented to investors, as part of the scripted pitch he used in 2014, that the EB-5 Program investments of Plaintiffs and others similarly situated would constitute merely "a part of" the Project funding due to all the support from governments, banks, and others. This was false and Xia knew it was false.

91.     Xia made other misrepresentations of material fact concerning these supposedly diverse funding sources, which Xia knew to be false when made.  Substantially all Project funding

derived from the EB-5 investments of Plaintiffs and others similarly situated, and Xia knew this at all relevant times.

92.     The EEGH I PPM projected the total costs of the Project would total $190,000,000, with $80,000,000 to be funded by loan proceeds from EB-5 investments; $45,300,000 to be funded through "a NYS Tax credit and New Market Tax Credit ("NMTC") financing"; $50,000,000 from an East West Bank Loan, and $14,700,000 from "Other Investment Sources."

93.     The EEGH II PPM projected the total costs of the Project would total $181,413,011, with $80,000,000 to be funded by loan proceeds from EB-5 investments; $17,000,000 to be funded through "NYS Tax Credits"; $44,413,011 in "Capital from Developer"; and $40,000,000 from a "Loan from Hapoalin Securities."

94.     The EEGH I Plan represents that "EEGH plans to finance up to $80 million of the approximately $190 million total project budget with EB-5 funds contributed by up to 160 EB-5 investors subscribing for $500,000 each.  The remaining $110 million will be provided through NYS tax credit, bank loans and other domestic sources."

95.     The EEGH II Plan represents that "EEGH II plans to finance up to $80 million of the approximately $181.4 million total project budget with EB-5 funds contributed by up to 100 EB-5 investors subscribing for $500,000 each.  The remaining $101.4 million will be provided through NYS tax credits, capital, and a loan from Hapoalin Securities."

96.     Xia did not actively seek, and never received, any "New Market Tax Credit" in relation to the Project.  On information and belief, the only action Xia took regarding any "New Market Tax Credit" was to obtain a "letter of interest" dated November 14, 2013, from an

employee of a financial firm, to assuage the USCIS.  Xia took no steps and made no efforts to actually secure any such tax credit.

97.     Xia did not, and never intended to, effectuate any loans or capital contributions represented in the Offering Documents to be forthcoming from any Project "Developer" (namely, Emerald and LaGuardia for EEGH I and EEGH II, respectively).  Xia and his entities never contributed any funds to the Project, and Xia knew, or was reckless in not knowing, this statement was false when made.

98.     On information and belief, Plaintiffs allege Xia submitted fraudulent documents and made false statements to the USCIS concerning private commercial loans purported to be forthcoming.

99.     On information and belief, Plaintiffs allege only a negligible amount of non-investor funds, if any, were actually obtained and used to finance the Project.

**I.    Misrepresentations Concerning Xia and the Project Management and Development Team**

100.    The stated experience and background record of a real estate project developer are material to investors.

101.    The PPMs describe the Project management and development team.  Xia is stated as having been "active for ten years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities."

102.    The PPMs represent that, as to Racanelli Construction Group, "[s]ince its founding, Racanelli has been responsible for building and renovation across a broad range and variety of market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail

stores, hotels, restaurants, houses of worship, self-storage complexes, condominiums and townhouses."

103.  The Plans further extol Racanelli Construction Group's experience and track record, as well as representing that it was founded "over decades ago".

104.  As described above, these representations were false and Defendants knew they were false when made. Racanelli Construction Group was formed by Xia in 2011 for the sole purpose of facilitating the Project, and its stated history and experience in the area are not only false, but copied from publicly available materials for the unrelated Racanelli Construction Co., Inc. Xia traded on the reputation and name of the preexisting and unrelated Racanelli Construction Co., Inc., to defraud investors.

105.  Indeed, in around April 2015, Racanelli Construction Co., Inc. brought trademark litigation against Xia and Racanelli, asserting that Xia "improperly assumed, utilized, displayed, and disseminated" the preexisting, protected trade name. The dispute settled in December 2015, with Xia acceding to "fully and completely refrain from any and all use of the name Racanelli in any capacity whatsoever," though he was allowed a carve-out to continue use of Racanelli in connection with the Project.

106.  In December 2015, Xia incorporated a new company, "Perini," to supplant Racanelli in its role with the Project. This name is itself similar to that of yet another unrelated, preexisting construction company (the "Tutor Perini Corp.") with no connection to Xia or the Project. Plaintiffs, and others similarly situated, were never informed of this replacement. Materials provided to investors continued to include Racanelli as general contractor.

107.  At all relevant times, Defendants failed to disclose Xia's ownership and control of supposed general contractors Racanelli and Perini. Neither PPM disclosed any association

between Xia and Racanelli, and in fact, Racanelli is falsely identified as an independent company.

108.    At all relevant times, Xia himself exercised de facto exclusive control over Racanelli and Perini despite any nominal employees on the records for both entities. Xia was, effectively, the general contractor of the Project.

109.    Both PPMs misrepresent material facts as to Xia's construction background and track record.  They represent that "Mr. Xia is a New York City real estate developer and President of the General Partner.  Mr. Xia has been active for ten years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities.  His company, Fleet Financial Group, Inc., specializes in 'green' projects[.]"

110.    These representations were false and Xia knew they were false when made.  Xia had only participated in a single construction project prior to the Project, referenced in the PPMs as "Shangri-La Towers".  The falsified experience was material to investors' assessment of Xia's competence and ability to successfully bring the Project to fruition.

111.    From the beginning, Xia and his so-called "development team" were inadequate and incapable with regards to the stated Project.  Xia formed nearly a dozen entities to cycle investor funds, yet, on information and belief, all entities had the same personnel who all used the same payroll company.

112.    On information and belief, Defendants have been issued several dozen violations by the New York City Department of Buildings (hereafter, "DOB") in relation to the Project, many of which suggest hazardous conditions at the site.  The DOB has issued numerous stop-work orders, including one currently in effect.

113.    On information and belief, Defendants violated the stop-work order on around January 4, 2019, and caused a wall on Northern Boulevard to collapse.  This event resulted in disruptions to gas, water, electrical, and telecommunications in the vicinity.   On information and belief, Xia was investigated for his role in the failures that contributed to this incident.

114.    On information and belief, Defendants have also been named in pending litigation commenced by ConEdison to recover damages against various Xia-affiliated entities, who are also subject to cross-claims brought by the City of New York.

**J.  Misrepresentations Concerning the Project Size and Scope in View of Zoning Restrictions**

115.    The EEGH I Plan provides: "The Project involves land acquisition, construction, management and operation of a mixed-use commercial project in Corona, Queens County, and overlooking Flushing Bay.  When complete, the hotels will boast 25 floors of 5-star Ocean view rooms."  The EEGH I Plan lists projected square footages: 346,246 for the 5-Star Hotel, 105,964 for the Convention Center, 97,180 for the Retail Shopping Area, 82,490 for the Parking Garage, and 11,300 for the Restaurant, for a total Project square footage of 643,180.

116.    The EEGH II Plan provides: "The Project involves the construction, management and operation of an expansion to a mixed-use commercial building in Corona, Queens County, overlooking Flushing Bay.  When complete, the hotel will boast 29 floors of 5-star ocean view rooms...The original building is a 25-story, 643,180 square footage structure that include 498 5-star luxury hotel rooms equal to 346,246 SF across 25 floors, a 1-story 105,964 SF convention center, 97,180 SF of retail space across 1 floor, 11,300 SF of restaurant space across 1 floor, and a 1-story, 82,490 SF parking garage.  The Project will

add to the original mixed-use commercial building by expanding on the existing 25 floors, as well as adding an additional 4 stories overall.  The expansion will result in an additional 556,398 SF being added to the overall building SF.  The expansion will also add an additional 294 5-star luxury hotel rooms equal to 383,803 SF across 29 floors, a 78,954 SF performing arts center across 5 floors, 39,089 SF of retail space across 6 floors, 46,231 of restaurant space across 5 floors, and 8,321 of parking garage space.  The completion of the Project will result in a 29-story, 1,199,578 SF, mixed-use commercial building.  The completed building will have a total of 792 5-star luxury hotel rooms equal to 730,049 SF across all 29 floors, as well as a 1-story, 105,964 SF convention center, a 5-story, 78,954 SF performing arts center, 136,269 SF of retail space across 6 floors, 57,531 SF of restaurant space across 5 floors, and a 1-story, 90,811 SF parking garage."

117.   All of these statements were false and Defendants knew they were false when made. Defendants never applied to, or obtained approval from, the DOB for the Project or its expansion as described in either Plan.  Instead, on information and belief, Defendants had only ever applied and obtained approval to build a 12-story building with a total zoning area of 350,186 square feet, with this application having been submitted sometime in 2014. Defendants' submitted plan did not include any convention center, retail space, or restaurant.  Defendants have not applied for any modifications or updates to the original filing as submitted in 2014.

118.   The original filing depicts a building that differs substantially from the Project as represented in the Offering Documents.  The permissible floor area, based on applicable zoning and land use ordinances, is a fraction of the projected size of the Project as described

to both EEGH I and EEGH II investors.  Again, no plans for a convention center, performing arts center, or retail space were ever applied for or approved by the DOB.

119.   Available records indicate Defendants had no intent of ever building the Project as described in the Offering Documents.

120.   On information and belief, Defendants themselves have admitted and affirmed the limited anticipated square footage of 350,178 in subsequent communications and applications submitted to the New York City Bureau of Standards and Appeals (hereafter, "BSA"). Defendants have not even maintained a pretense with the DOB or other responsible governmental agencies that the Project represented in the Offering Documents was at any relevant time possible or even intended to be completed.  This square footage falls incurably short of either the 643,180 square feet misstated for the EEGH I phase of the Project and the nearly 1.2 million total square feet misstated for the EEGH II phase, with *knowledge that not even the first phase was legally permitted*.

**K.  Material Omissions Concerning Floor Area Ratio and Zoning**

121.   Defendants failed to disclose at any time to Plaintiffs and others similarly situated that the hotel, as described in the Offering Documents, was impossible to build at the promised size, nature, and features without the DOB and BSA granting necessary variances.

122.   Defendants intentionally omitted material information pertaining to zoning floor area (hereafter, "ZFA") which dictates the maximum allowable floor area for a prospective development site.

123.   Maximum ZFA is calculated from the applicable floor area ratio (hereafter, "FAR").

124.   FAR involves a mathematical formula dictating the maximum developable square footage at a site in proportion to the total lot area.  To calculate the maximum developable square

footage, the area is multiplied by the FAR factor, which delineates the maximum permissible floor area for a building regardless of the number of planned floors. A designated FAR factor is set by local zoning codes based on building use and zoning district.

125. The maximum ZFA for a mixed-use building is limited by the highest FAR of any single use in the building, though each use cannot exceed its own individual FAR.

126. On information and belief, 350,178 was the maximum ZFA allowed by the DOB and BSA.

127. On information and belief, filings made to the DOB as to the Project claimed a "community facility" use to increase the Project's FAR to 4.8. This figure gives the Project its maximum ZFA of around 350,000 (72,955 square feet multiplied by the 4.80 FAR).

128. However, as stated above, any given commercial portion of the Project cannot exceed its own individual FAR of 2.00. Thus, the Project's maximum CFA committable to commercial use would be 145,910 (72,955 square feet multiplied by the 2.0 commercial FAR). This maximum allowable hotel size, around 150,000 square feet, falls incurably short of the 346,246 hotel square footage promised in the EEGH I phase, much less the 730,049 total projected for the EEGH II phase.

129. Defendants have never at any time sought any of the variances that would be necessary to increase the permissible ZFA toward the falsely represented figures shown to Plaintiffs and others similarly situated to induce their investments.

130. The size of the disparity between the Project, as represented and described in the Offering Documents, and the maximum ZFA, which Defendants would have known if they knew anything about New York City construction, lacks any legitimate explanation except that

Defendants never intended to build the Project as described and knew that any representations to the contrary were false when made.

131. The permissible ZFA also leaves insufficient space for the purported convention center, performing arts center, and retail center described in the EEGH II PPM and Plan, which together would far exceed the 145,910 square foot limitation.

132. Defendants never submitted any plans to the DOB or BSA containing any convention center, performing arts center, or retail center.  The plans that were submitted did not match, and fell far short of, projections for the initial mixed-use complex. They described a very different building than what investors believed they were funding.  Defendants nevertheless continued to make false statements and representations to Plaintiffs and others similarly situated that the Project could be completed as described in the Offering Documents.

133. Plaintiffs and others similarly situated would not have invested $500,000 each if not for Defendants' egregious omissions and intentional, knowing, or at least reckless misrepresentations of material fact regarding the Project's size, scope, and applicable zoning regulations that rendered the Project as described in the Offering Documents impossible to construct.

134. The unjustifiable discrepancies in Project square footage affect many key aspects of the Project, material to investors including Plaintiffs and others similarly situated, including budget requirements, EB-5 Program job creation metrics, and the availability of non-EB-5 funding that might otherwise be used to create the requisite EB-5 jobs upon which their immigration applications depend.

**L.  Material Omissions Concerning Rental Agreements**

135.  The PPMs represented that there would be "no material conflicts of interest between the General Partner and its affiliates on the one hand and the Partnership on the other hand." The PPMs also outline and explicitly state Fleet's fiduciary duty to the Partnership and the limited partners, comprising Plaintiffs and others similarly situated.  Xia owed EEGH I, EEGH II, and the investors of each, an obligation to exercise good faith in furtherance of Project affairs.

136.  On information and belief, Xia entered numerous self-dealing side agreements between Emerald, LaGuardia, and other entities he owned and controlled. These agreements, which were never disclosed to investors, constituted material omissions and severely impaired the ability of developers to repay the Loan Agreements to each of EEGH I and EEGH II.

137.  On information and belief, on around September 28, 2015, LaGuardia entered a lease agreement with Emerald requiring LaGuardia to pay Emerald annual rent in an amount of $3.5 million (later increased to $4.5 million).  LaGuardia has never made any repayments toward this loan and owes over $16 million in unpaid rent to Emerald per the terms of this lease agreement.  Xia signed for both sides of the lease agreement, as is typical of his self-dealing business practices.

138.  These omissions are material in that the agreements govern the rights to enforcement of loan repayment obligations, which in turn seriously affects investors' ability to recover repayment.  Under the current, undisclosed arrangement, Emerald has the right under the Loan Agreement to pursue remedies for default against LaGuardia, yet of course Xia will not choose to do so.  This poses significant risks to Plaintiffs and others similarly situated,

who do not have independent means of recourse against Emerald under the Loan Agreements.

**M. Misrepresentations Concerning Westin Affiliation**

139.   As stated above, marketing materials presented to investors by Xia contained false representations that the Project would be affiliated with or sponsored by the well-known Westin Hotel chain.   No such arrangement, endorsement, or affiliation existed at any relevant time, nor were there serious plans or steps taken to cause such an arrangement, endorsement, or affiliation to materialize.   Defendants knew at all relevant times, or were reckless in not knowing, that this was the case – that no Westin connection existed beyond a tentative "letter of interest" obtained in 2014 to pacify USCIS questioning.

140.   These representations would be material to any reasonable investor.

**FIRST CLAIM – FRAUD IN THE INDUCEMENT**
(AGAINST XIA; FLEET)

141.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

142.   As detailed herein, Defendants made false and materially misleading representations, concealments, and omissions of material fact, orally and in writing, in connection with the Project.   These misrepresentations were material to Plaintiffs' decisions to invest in the Project and the decisions of others similarly situated.

143.   Specifically, as to all Defendants, the false representations and omissions of material fact include, but are not limited to: representations as to the experience and expertise of Xia and the Project's "Management and Development Team"; continuous and willful misappropriation and misuse of investors' funds; representations as to Racanelli's reputation, experience, and arguably its very identity; representations as to Project funding

sources; representations as to Project size and scope; omissions as to floor area ratio and applicable zoning restrictions; omissions and misrepresentations as to self-dealing rental agreements; and representations of an affiliation of the Project to the Westin hotel chain.

144. Defendants made the above-stated misrepresentations or omissions with knowledge or recklessness as to falsity.

145. Defendants made the above-stated misrepresentations and omissions with the intent that Plaintiffs and others similarly situated would rely upon them in their decisions to invest in the Project.

146. Plaintiffs and others similarly situated reasonably and actually relied upon Defendants' statements and omissions in investing $500,000 each in the Project and in paying related administrative fees.

147. Defendants' misrepresentations and omissions were the actual and proximate cause of damages suffered by Plaintiffs and others similarly situated in an amount to be proven at trial, but in no case less than $500,000 each, plus other common consequential and incidental costs and fees to be proven at trial.

148. Defendants' misrepresentations were made willfully, wantonly, and maliciously, entitling Plaintiffs and others similarly situated to punitive damages.

## SECOND CLAIM — CONSTRUCTIVE FRAUD
### (AGAINST XIA, FLEET)

149. The Plaintiff EB-5 Investors re-allege and incorporate paragraphs 1-140 above as if fully set forth herein.

150. The EB-5 Investors reposed their trust and confidence in Xia and Fleet to manage the Partnership and their investment therein in the best interests of the Partnership and for the benefit of the EB-5 Investors.

151. The EB-5 Investors are foreign citizens with a limited understanding of the laws and financial practices of the United States.

152. Xia and Fleet knowingly and voluntarily accepted the custody of the EB-5 Investors' funds and undertook the duty to advise, counsel, and protect the EB-5 Investors during the course of the Project.

153. Xia and Fleet took unconscionable advantage of the EB-5 Investors, thus abusing the fiduciary and confidential relationship they had with the EB-5 Investors.

154. Specifically, Xia and Fleet abused their relationship with the EB-5 Investors by engaging in continuous acts of self-dealing, gross negligence, and recklessness marked by: (i) the misuse of Partnership funds, (ii) continued omissions and misrepresentations directed at the EB-5 Investors in connection with the management, value, scope, and performance of the Project, (iii) the unilateral self-dealing and sham arrangements with the Emerald and LaGuardia that had no purpose other than to wrongfully and personally benefit Xia, and (iv) participation in overarching fraud both in the inducement and in the scope of misusing the EB-5 Investor's funds.

155. The actions of Xia and Fleet are wrongful, and the results thereof are inequitable.

156. The EB-5 Investors were harmed by the inequitable and wrongful actions of Xia and Fleet. Specifically, their investment in the Partnership has been drastically reduced in value and, in fact, has been completely lost due to the concealed impossibility of Project.

157. As such, the EB-5 Investors demand judgment against Xia and Fleet for compensatory damages in an amount to be determined at trial, together with interest at the maximum rate allowable, and injunctive relief, including without limitation, appointment of a receiver or corporate monitor, along with such other relief the Court deems just and proper.

## THIRD CLAIM—AIDING AND ABETTING FRAUD

(AGAINST ALL DEFENDANTS)

158.   The EB-5 Investors re-allege and incorporate paragraphs 1-140 above as if fully set forth herein.

159.   Xia defrauded the EB-5 Investors.

160.   Defendant Xia dominates and controls all of the Defendants.  Under Xia's control and direction, each of the Defendants participated in and committed the misconduct described in the First and Second Claim.

161.    Fleet, Emerald, LaGuardia, and Yue had actual knowledge of the fraud being committed against the EB-5 Investors because of Xia's common control over Emerald, LaGuardia, and Yue's awareness of the proper use of the EB-5 investment funds and illegitimate transfers that Yue facilitated.

162.   Fleet, Emerald, LaGuardia, and Yue rendered substantial assistance to the fraud perpetrated against the EB-5 Investors by: (i) acting as the conduits through which Xia would make representations regarding the Project, (ii) acting as recipients and custodians of Partnership funds, (iii) executing and disseminating documents affecting the Project, (iv) engaging in the investment and corporate structure masterminded by Xia, (v) facilitating illegitimate transfers of the EB-5 Investors' money, and (vi) wrongfully converting EB-5 funds for Yue's personal use.

163.   As a result of the fraud perpetrated against the EB-5 Investors, and Fleet, LaGuardia, and Yue's substantial assistance in support thereof, the EB-5 Investors have been harmed through their initial and continued investment in the Project, despite the project not being managed, valued, or represented as promised.

164. As such, the EB-5 Investors demand judgment against Fleet, Emerald, LaGuardia, and Yue for compensatory damages in an amount to be determined at trial, together with interest at the maximum rate allowable, along with such other relief the Court deems just and proper.

### FOURTH CLAIM—BREACH OF FIDUCIARY DUTY
### (AGAINST XIA; FLEET)

165. Plaintiffs repeats and incorporates by reference paragraphs 1 through 140 as if fully set forth herein.

166. Defendants Xia and Fleet owed Plaintiffs and others similarly situated fiduciary duties to act in Plaintiffs' financial best interest.

167. Defendants Xia and Fleet owed Plaintiffs and others similarly situated a fiduciary duty arising from the partnership relationship between Fleet as General Partner and each Plaintiff and others similarly situated as limited partners, and that Fleet was at all relevant times an "alter ego" of Xia.

168. Defendants Xia and Fleet breached their fiduciary duties by acts or omissions including but not limited to: failing to comply with reporting and disclosure obligations stated in the Offering Documents; failing to disclose zoning and height restrictions rendering the Project impossible to construct as described in the Offering Documents; concealing material information and updates as to the development of the Project; and misappropriating and misusing the funds invested by Plaintiffs and others similarly situated through numerous self-dealing transactions and transfers between entities and accounts controlled and dominated by Xia and/or his wife, Yue, for improper and substantial personal benefit and without legitimate business purpose.

169. Defendants Xia and Fleet's breaches of fiduciary duty were the actual and proximate cause of damages suffered by Plaintiffs and others similarly situated in an amount to be proven

at trial but in no case less than $500,000 each plus other common consequential and incidental costs and fees to be proven at trial.

170. Defendants' breaches of fiduciary duty were made willfully, wantonly, and maliciously, entitling Plaintiffs and others similarly situated to punitive damages.

171. In addition to monetary and punitive damages, Plaintiff and others similarly situated are entitled to an accurate accounting of the Project and of the assets of EEGH I, EEGH II, Emerald, and LaGuardia to fully redress the alleged breaches of fiduciary duty.

## FIFTH CLAIM—AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS)

172. Plaintiffs repeat and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

173. Defendants Xia and Fleet breached their fiduciary duties to Plaintiffs and others similarly situated as set forth in the Fourth Claim above.

174. Defendant Xia dominates and controls all of the Defendants.  Under Xia's control and direction, each of the Defendants participated in and committed the misconduct described in the Fourth Claim.

175. Each of the Defendants knowingly provided substantial assistance to Fleet in furtherance of misconduct constituting breach of fiduciary duty to Plaintiffs and others similarly situated, and have received improper financial benefits as a result.

176. Each of the Defendants committed the misconduct alleged above willfully, wantonly, and maliciously, entitling Plaintiffs and others similarly situated to punitive damages.

177. In addition to monetary and punitive damages, Plaintiff and others similarly situated are entitled to an accurate accounting of the Project and of the assets of EEGH I and EEGH II to fully redress the alleged breaches of fiduciary duty.

## SIXTH CLAIM—CIVIL CONSPIRACY

### (AGAINST ALL DEFENDANTS)

178.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

179.   Defendants Xia, Yue, and other known and unknown individuals, committed acts constituting civil conspiracy furthering the tortious acts recounted above.

180.   Pleading "a prima facie showing of a conspiracy requires allegation of a primary tort and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F.Supp.2d 431, 446 (S.D.N.Y. 2000).

181.   Defendants Xia, Yue, and other known or unknown individuals, made coordinated and concerted maneuvers that provided the necessary infrastructure and transactions to funnel investor money for their own personal use and benefit.

182.   These acts included, among others, signing loan agreements central to the fraud; improperly transferring investor funds into personal accounts; controlling entities engaged in the fraud; and reaping substantial personal benefit through ill begotten investor funds.

183.   As such, the EB-5 Investors demand judgment against Xia and Yue for compensatory damages in an amount to be determined at trial, together with interest at the maximum rate allowable, along with such other relief the Court deems just and proper.

## SEVENTH CLAIM—GROSS NEGLIGENCE

### (AGAINST XIA)

184.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

185.   At all relevant times, Xia owed an established legal duty of care to the Plaintiffs' and similarly situated individuals.

186.   As described herein, Defendant Xia acts evidence a wholesale absence of care.

187.   Specifically, as fully outlined herein, Xia's grossly negligent acts include his actions in misappropriating the investors' funds in direct contravention to the directives of the offering documents.

188.   At all relevant times, Defendant Xia, as the General Partner, had a duty to employ the Plaintiffs' funds (as well as similarly situated investors) with ordinary and reasonable care. By deliberately and willfully misappropriating the investors' funds, Defendant Xia's actions constitute incidences of gross negligence resulting in Plaintiffs' investment losses.

189.   Defendant's gross negligence was the actual and proximate cause of damages suffered by Plaintiffs and others similarly situated in an amount to be proven at trial but in no case less than $500,000 each, plus other common consequential and incidental costs and fees to be proven at trial.

## EIGHTH CLAIM—NEGLIGENT MISREPRESENTATION
(AGAINST XIA; FLEET)

190.   Plaintiffs repeat and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

191.   Defendants made false and materially misleading representations, concealments, and omissions of material fact, orally and in writing, to Plaintiffs and others similarly situated in connection with the Project. These facts were material to the Plaintiffs' decisions to invest in the Project and the decisions of others similarly situated.

192.   These false and materially misleading representations, concealments, and omissions of material fact were made by Defendants in the course of Defendants' business.

193.  Specifically, as to all Defendants, the false representations and omissions of material fact include, but are not limited to: representations as to the experience and expertise of Xia and the Project's "Management and Development Team"; continuous and willful misappropriation and misuse of investors' funds; representations as to Racanelli's reputation, experience, and arguably its very identity; representations as to Project funding sources; representations as to Project size and scope; omissions as to floor area ratio and applicable zoning restrictions; omissions as to self-dealing rental agreements; and representations of an affiliation of the Project to the Westin hotel chain.

194.  Defendants made the above-stated misrepresentations or omissions without exercising reasonable care to ascertain the truth or falsity of the representations or omissions of fact and as to their gathering and dissemination.

195.  Defendants made the above-stated misrepresentations or omissions with the intent that Plaintiffs and others similarly situated rely upon them in their decisions to invest in the Project.

196.  Plaintiffs and others similarly situated actually and justifiably relied upon Defendants' statements and omissions.

197.  Defendants' misrepresentations and omissions were the actual and proximate cause of damages suffered by Plaintiffs and others similarly situated in an amount to be proven at trial but in no case less than $500,000 each, plus other common consequential and incidental costs and fees to be proven at trial.

## NINTH CLAIM—BREACH OF CONTRACT
### (AGAINST XIA; FLEET)

198.  Plaintiffs repeat and incorporate by reference paragraphs 1 through 140 as if fully set forth herein.

199. "To state a claim for breach of contract under New York law, a party must allege: (i) the existence of an agreement between the plaintiff and defendant; (ii) due performance of the contract by the party alleging the breach; (iii) a breach; and (iv) damages resulting from the breach." *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F.Supp. 285, 290 (S.D.N.Y. 1995).

200. Defendants created offering documents for EEGH I and EEGH II in order to solicit foreign EB-5 investors.

201. The offering documents provided rights for the Plaintiff-investors, and responsibilities for the Defendants, agreed upon by all parties in exchange for Plaintiffs' investment capital.

202. As outlined herein, Defendants failed to perform critical, express provisions of the agreement: provisions central to demonstrating proper use of investor funds and compliance with the contractual representations.

203. Defendants' breach of contract has produced substantial damages, including loss of Plaintiffs' investment capital, and impaired—likely destroyed—immigration prospects.

204. Defendants' breaches were the actual and proximate cause of damages suffered by Plaintiffs and others similarly situated in an amount to be proven at trial but in no case less than $500,000 each, plus other common consequential and incidental costs and fees to be proven at trial.

## TENTH CLAIM—JUDICIAL EXPULSION OF GENERAL PARTNER FROM PARTNERSHIP AND APPOINTMENT OF RECEIVER
### (AGAINST THE GENERAL PARTNER AND THE PARTNERSHIP)

205. The Plaintiffs reallege and incorporate paragraphs 1–140 above as if fully set forth herein.

206. The General Partner, Fleet, has: (i) engaged in wrongful conduct that has adversely and materially affected the Partnership's activities, (ii) willfully and persistently breached

material provisions of the Partnership Agreement and of duties owed to the Partnership and the EB-5 Investors, as limited partners, and (iii) engaged in conduct relating to the Partnership's activities which makes it not reasonably practical to carry on the activities of the Partnership with the General Partner as a general partner.

207.   Specifically, the General Partner has disregarded the representations it made in the Offering Documents to the EB-5 Investors, acted for the personal benefit of Xia, the benefit of Emerald, LaGuardia, and other companies, failed to convey key information to the EB-5 Investors regarding development of the Project, failed to enforce the rights of the Partnership, and otherwise assisted in the fraud masterminded by Xia.

208.   As stated above, the Plaintiffs made an investment in consideration of both economics and immigration prospects, with both being inexorably intertwined.  Unlike a traditional investment, however, the return of investment funds through money damages results in the complete and total loss of an investor's immigration process.  As such, and as always, equity demands that to be *done which ought to have been done*.

209.   The only way to accomplish equitable goals is for the Court to order appointment of a Receiver, to seize control of all known assets, and to deploy them in conformity with the requirements of the EB-5 program that were outlined in the relevant Offering Documents.

210.   "A federal court has the power in equity to appoint a receiver in order to protect a party's interest in property ... pending resolution of a dispute over ownership or control between it and another party with a claim to the property." *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365-66 (S.D.N.Y. 2000) (citing *Fed. R. Civ. P.* 66).

211.   Factors that courts consider in deciding whether to appoint a receiver include:

[f]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the

49

available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop., LLC*, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012) (citation omitted). See also *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (appointment of a receiver is "an extraordinary remedy that should be employed with the utmost caution and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties.") (citing 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2012)); *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997) ("The appointment of a receiver is considered to be an extraordinary remedy, and should be employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property.") (internal citations omitted); *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993) ("A receiver is an extraordinary equitable remedy that is only justified in extreme situations."); *In re Oakland Lumber Co.*, 174 F. 634, 636–37 (2d Cir. 1909) ("[I]n no case should a remedy so far reaching in its effects be resorted to except upon clear and convincing proof.").

212. As such, the Court should expel the General Partner as general partner of the Partnership for this conduct.

213. A demand by the EB-5 Investors to the General Partner to seek judicial expulsion of itself from the Partnership would be futile because Xia, who controls Fleet, and other related entities, is not willing to give up control of the Project and would not be willing to remove himself from the Partnership.

214.   As such, the Plaintiff-class demands entry of judgment against the General Partner and the Partnership, expelling the General Partner as general partner of the Partnership, along with such other relief the Court deems just and proper, including appointment of a Receiver.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request Court enter judgment on all counts against Defendants and award the following:

A.   Certification of the class under Rule 23 of the Federal Rules of Civil Procedure;

B.   An award of money damages in an amount to be determined at trial, but in no case less than $500,000 and the administration fee of $50,000 per Class Member, including interest thereon, against Defendants jointly and severally, vicariously, and as alter egos of Xia;

C.   Punitive and exemplary damages in an amount to be determined at trial;

D.   An accounting by Xia and Fleet for the Project and all EEGH I and EEGH II assets;

E.   Attorneys' fees;

F.   Court costs;

G.   Temporary restraining order and preliminary injunctive relief;

H.   Permanent injunctive relief;

I.   Asset freeze;

J.   Appointment of a Receiver;

K.   Other relief as the Court may deem proper;

## JURY DEMAND

Plaintiffs BO JIN and YANG SONG demands a trial by jury on all issues triable by a jury.

Dated: February 9, 2022
      Stowe, Vermont                Respectfully submitted,

                                  Barr Law Group

                                  By:    /s/ Russell Barr
                                          Russell D. Barr

                                          Chandler W. Matson

                                          125 Mountain Road

                                          Stowe, Vermont 05672

                                          Phone: (802) 253-6272

                                          Fax: (802) 253-6055

                                          *Attorneys for Plaintiffs*